**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| SAVANAH COLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:04-CV-262-PRC |
| | ) | |
| LINCOLNSHIRE HEALTH CARE | ) | |
| CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on (1) a Motion for Summary Judgment [DE 18], filed by the

Defendant, Lincolnshire Health Care Center ("Lincolnshire"), on May 25, 2005, and (2) a Joint

Motion for Continuance of Trial [DE 28], filed by the parties on October 10, 2005.  For the

following reasons, Lincolnshire's Motion for Summary Judgment is granted, and the Motion for

Continuance of Trial is denied as moot.

**PROCEDURAL BACKGROUND**

The Plaintiff, Savanah Cole, filed a Complaint against Lincolnshire on July 13, 2004.  In the

Complaint, Cole alleges violations of Title VII of the Civil Rights Act of 1964 and the Age

Discrimination in Employment Act.  First, Cole claims that Lincolnshire engaged in racial

discrimination when it denied her the opportunity to work the same number of hours as Cole's

Caucasian co-workers and by unjustly terminating her employment.  Second, Cole alleges that

Lincolnshire intentionally discriminated against her based on age.  This claim is based on

1

Lincolnshire's alleged unwillingness to offer Cole the same amount of hours as her younger co-workers. Further, Cole bases her age claim on Lincolnshire's actions when it discharged Cole and hired younger workers to do work that Cole could perform. Based on these allegations, Cole seeks compensatory, consequential, and punitive damages as well as attorney fees against Lincolnshire.

Lincolnshire filed an Answer on August 26, 2004, denying the material allegations of the Complaint.

On May 25, 2005, Lincolnshire filed a Motion for Summary Judgment. Cole filed her Brief in Opposition to the Motion for Summary Judgment on July 14, 2005. A Reply Brief in Support of the Motion for Summary Judgment was filed by Lincolnshire on July 26, 2005.

The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate-in fact, is mandated-where there are no

2

disputed issues of material fact and the movant must prevail as a matter of law.  In other words, the record must reveal that no reasonable jury could find for the non-moving party."  *Dempsey v. Atchison, Topeka, & Santa Fe. Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party may discharge its "initial responsibility" by simply "'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the non-moving party's case."  *Id.* at 325.  When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1526 (7th Cir. 1990).  However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists.  *Kaszuk v. Bakery & Confectionary Union & Indus., Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings.  Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).  Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule,

must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party.  *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  A court's role is not to evaluate the weight of the evidence, to judge the credibility of the witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.  *Anderson*, 447 U.S. at 249-50; *Doe*, 42 F.3d at 443.

No heightened standard of summary judgment exists in employment discrimination cases nor is there a separate rule of civil procedure governing summary judgment in employment cases.  *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)).  However, intent and credibility are critical issues, frequently found in employment cases, which are genuinely contestable.  *Id.*  Nevertheless, summary judgment in favor of the defendant is hardly unknown, or for that matter, rare, in employment discrimination cases.  *Wallace*, 103 F.3d at 1396.

## FACTUAL BACKGROUND

The facts viewed in the light most favorable to the non-moving party, Cole, are as follows. Cole is an African-American female who was seventy years old at the time of the alleged discrimination. In 1957, Cole became a registered nurse, and in 1990, she became certified as a respiratory therapist. For thirty years, Cole worked at St. Mary's Northwest Hospital ("St. Mary's"). During her thirty years at St. Mary's, Cole rose to the position of supervisor of the respiratory therapist department. After St. Mary's ceased operations, Cole began work for Diane Blessengain's agency, which placed her at various hospitals in the area. During Cole's forty-year career, she was never written up for deficiencies in her work performance.

In March 2003, Cole, who was sixty-nine at the time, was hired by Lincolnshire as a respiratory therapist. Cole was hired on PRN status. PRN status dictated that Cole was scheduled for available hours only after the obligations to both the full-time and part-time employees were fulfilled. At the beginning of her employment, Cole was scheduled for one day a week on average. On July 15, 2003, five months into her employment with Lincolnshire, Cole was evaluated by Dixie Christiansen, the supervisor in the respiratory therapy department. The evaluation showed that Cole was achieving "G" or Good status in every applicable category.[1] Her average score was a 77.4 for an overall Good evaluation. During her entire employment at Lincolnshire, Cole was never written up by any of her supervisors for problems with her job performance.

In September of 2003, Robert Bachert assumed the position of respiratory unit supervisor and thus became Cole's direct supervisor. Problems began between Bachert and Cole immediately.

---

[1] The performance evaluations provided five categories for an evaluator to choose from: Outstanding, Very Good, Good, Improvement Needed, and Unsatisfactory.

After he became supervisor, Bachert received reports from Dixie Christensen, Dan McDermott, and Sheri Miller detailing alleged mistakes in patient care made by Cole.  Around the same time as the alleged mistakes were being reported in the Fall of 2003, Cole claims she was no longer being scheduled for shifts at Lincolnshire.  However, pay records demonstrate that Cole was paid through December of 2003.  In September 2003, Cole averaged 15 hours per week.  In October, that average was reduced to an estimate of around 5 hours per week.  Further, the pay records indicate that Cole was scheduled for a combined total of 8 hours in November.  Her hours increased in December as she worked approximately 40 hours.  Cole asserts Bachert told her that he was not going to schedule her anymore because she "had made too many mistakes and had almost let a patient die on the vent, which I hadn't been wrote up or nothing about it." Pl. Br., Ex. 1, p. 31 (Cole Dep.).  Further, the two co-workers who reported the alleged incidents told Bachert that Cole "wasn't as sharp as [she] used to be."  *Id*. at 30-33.

Further, Cole claims she was not the only employee that was taken off the schedule.  She claims that African American PRN employees were taken off the schedule while Caucasian PRN employees continued to be scheduled.  Another Lincolnshire respiratory therapist employed at the same time also contends that once Bachert became supervisor, "white PRN's continued to receive work hours after the black PRN's were denied hours." Pl. Br., Ex. 4, p. 1 (English Aff.).  Further, Cole remembers another employee, Debra Wells, mentioned that Lincolnshire wanted to keep it "Lilly white," which Cole interpreted to mean African Americans were not welcome at the facility. Pl. Br., Ex. 1, p. 28 (Cole's Dep.).

The first incident involving Cole occurred around the end of August 2003 and was reported by Christensen, the former supervisor of the respiratory therapy unit.  While Christensen was the

supervisor of the respiratory therapy unit, she responded to a ventilator alarm set off by Cole's quadriplegic patient, John McRoberts.  At the time of the alarm, Cole was checking on another patient in the same room and nurse's aides were tending to Mr. McRoberts.  Cole heard the alarm in the room, but the nurse's aides silenced it so Cole did not immediately check the problem until the aides told her the patient was not breathing.  During the alarm, Christensen claims that Cole was unable to ascertain the problem and reached for an electric nebulizer instead of an ambu bag which would have revived the patient.  The nebulizer was useless in the situation and Christensen had to help Cole reconnect the ventilator and use the ambu bag.  However, Cole notes that "no way I could reach for a nebulizer treatment when I know an ambu bag is what we breathe with the patient . . . [the statement] is not true."  Pl. Br., Ex. 1, p. 34 (Cole Depo).  Cole denies in her deposition having reached for the nebulizer treatment.  The patient was eventually reconnected to the ventilator, and Cole asked Christensen for the ambu bag, which brought the patient back.  By the time the ventilator was reconnected, the patient had turned blue due to the lack of oxygen.  Christensen was concerned after the incident that her presence may have contributed to the confusion.  When she asked Cole whether or not her presence had created a problem, Cole indicated that it did not.

The second incident was reported by Dan McDermott, a Lincolnshire respiratory therapist who has twenty-seven years of experience.  A patient in his late seventies was placed on constant positive airway pressure ("CPAP") during the evening hours so he could sleep better.  On the day in question, Cole was in charge of the patient and was responsible for taking him off of the CPAP in the morning and placing a cannula in the nose for breathing during the daytime hours.  However, McDermott contends that when he checked on the patient at the request of the patient's family member, the patient was in distress and in need of immediate assistance.  Cole does not remember

anyone ever reporting the problem to her.  McDermott reported to Bachert that the source of the problem was that Cole neglected to turn on the oxygen when she made the switch from CPAP to the cannula.  Because of this oversight, the patient was struggling to breathe.  Once the problem was remedied, the patient recovered.  Cole denies having forgotten to turn on the oxygen and states in her deposition that she did turn on the oxygen after giving the patient his breathing treatment.

The third and final alleged incident was reported by Sheri Miller and involved her son, Jeff Miller, who was a quadriplegic.  Jeff Miller was on constant oxygen and Ms. Miller had complained to McDermott that Cole had left an oxygen tank next to his face, concerned because an oxygen tank left next to a patient's face risks burning the patient by the liquid oxygen.  However, Cole contends she never placed the oxygen by Miller's face.

None of these incidents was written up, nor was Cole ever called in by Bachert to discuss the reported incidents.

After Bachert received the complaints, he reviewed McRoberts' patient record, which confirmed that the patient was in distress because of a lack of oxygen.  Further, the ventilator flow sheet records were initialed by Cole and supported the first report received by Bachert.  It cannot be ascertained from the patient record who caused the problem.  Bachert never witnessed any of these incidents himself.  But Bachert trusted the employees who reported the first two incidents because of their experience as respiratory therapists.  Regarding the first incident involving McRoberts, Bachert claims he did not investigate because he assumed that Christensen had taken care of the problem as it had occurred under her supervision.  Further, Bachert did not speak with the patients because one is deceased and the others cannot speak.  However, Bachert never made any attempt to speak to Ms. Miller regarding the care of her son.

8

Cole confronted Bachert about his refusal to schedule her for any employment hours and about statements Cole heard regarding her job performance.  During this meeting, Bachert told Cole that he was basing his decision on what her co-workers and Ms. Miller had told him, including the comment that Cole "was not as sharp as [she] used to be."  Pl. Br., Ex. 1, p. 32 (Cole Dep.).  In response to that comment during their conversation, Cole pointed out that she had found a non-functioning concentrator that a co-worker had left on a patient.  She reminded Bachert that she had shown the concentrator to Bachert who replied that it was working at last check; however, Cole was able to demonstrate that it was no longer working properly.  Cole commented "I was sharp enough to find that vent that you all didn't find working every day with a patient."  *Id*. at 37.  She also remembers that Bachert told Cole he did not call her in to discuss the incidents because he did not want to hurt her feelings.  Bachert admitted he did not handle the situation properly.

After Cole was terminated, two new PRNs were hired.  They were both Caucasian and age fifty-one and twenty-nine respectively.  The employment numbers provided by Lincolnshire focused on the total number of employees in January and July of 2004.  These numbers show that in January of 2004, Lincolnshire employed one hundred and fifteen people.  Of those one hundred and fifteen people, fifty-two were Caucasian (45%), sixty-three were African American (55%), and sixty were over the age of forty (52%) compared to the fifty-five who were under the age of forty (48%).[2] These numbers did not greatly change in July of 2004 as Lincolnshire employed one hundred twenty-four people with fifty-nine Caucasian employees (48%) and sixty-five African American

---

[2]  All percentages are approximations and were created using the numbers provided by Lincolnshire interrogatory answers 4F, 22 and 23.  *See* Def. Br., Ex. 8, p. 32-33.

employees (52%). Further, Lincolnshire employed sixty-one employees (49%) under the age of forty and sixty-three employees (51%) over the age of forty.[3]

Lincolnshire also provided employment numbers focusing on the number of employees it either terminated, discharged or laid off within 2003 and 2004. These numbers show that in 2003 Lincolnshire stopped employing twenty-nine people. Of those twenty-nine, ten (34%) were over the age of forty. Also, of those twenty-nine, sixteen were African American (55%), one was Asian, one was Hispanic, and the rest were Caucasian (44%). In 2004, Lincolnshire terminated a total of twelve employees by October of that year. Three were over the age of forty (25%), and the rest were under forty (75%). Finally, eight of the twelve were African American (67%) with the rest being Caucasian (33%).

## DISCUSSION

In her Complaint, Cole claims that Lincolnshire engaged in impermissible age and/or race discrimination by denying her an equal number of work hours compared to other younger and/or Caucasian employees and by discharging her unjustly. Lincolnshire denies that Cole's age or race were motivating factors in any of the alleged adverse employment actions and asserts that there are legitimate non-discriminatory reasons for its challenged employment actions. Based on these contentions, Lincolnshire moves for summary judgement on each of Cole's claims of age and race discrimination.

---

[3] In her response brief, Cole contends that Lincolnshire did not provide the employment statistics requested by her for the period from September 2003 through December 2003. However, a review of Cole's interrogatories demonstrates that she only requested the number of all employees, Caucasian employees, African American employees, employees under the age of 40, and employees over the age of 40 for the period of January 1, 2004, through July 1, 2004.

**A. Standards**

*1. Employment Standards for Age and Race Discrimination*

While the Age Discrimination in Employment Act ("ADEA") provides a cause of action for employees who have suffered an adverse employment action based on their age, Title VII of the Civil Rights Act of 1964 ("Title VII") does the same for adverse employment actions based on race. The purpose of the ADEA is "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment . . . ." 29 U.S.C. § 621(b). The ADEA provides that "it shall be unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a). In order to be protected by the ADEA, an employee must be at least forty years of age and must establish the she would not have suffered an adverse employment action "but for" the employer's motivation to discriminate based on age. *See* 29 U.S.C. § 631(a); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003).

Title VII provides, in relevant part:

It shall be an unlawful employment practice for an employer–
(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges or employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e-2(a). To be actionable, the offensive conduct must be based on one of the characteristics protected by Title VII, such as race. *See* 42 U.S.C. § 2000e-2(a)(1).

In both age and race discrimination cases, a plaintiff may choose to utilize the direct or indirect method of proof to establish a claim of employment discrimination. *See Isbell v. Allstate*

11

*Ins. Co.*, 418 F.3d 788, 794 (7th Cir. 2005) (age); *Dandy v. United Parcel Serv.*, 388 F.3d 263, 272 (7th Cir. 2005) (race).  Regardless of the method, the burden is on the plaintiff to demonstrate that a genuine issue of material fact exists for trial.  *See Markel v. Bd. of Regents of the Univ. of Wisc. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002).

*2. Direct Method of Proof*

 Under the direct method of proof, a plaintiff may demonstrate discrimination with either direct evidence or circumstantial evidence.  *Isbell*, 418 F.3d at 794.  In other words, the plaintiff must show either "an acknowledgment of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination."  *Dandy*, 388 F.3d at 272 (citing *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)).

Direct evidence is evidence which, "if believed by the finder of fact, will prove the particular fact in question without reliance upon inference or presumption."  *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Prot.*, 344 F.3d 680, 689 (7th Cir. 2003) (citing *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)) (internal quotation marks omitted).  Further, direct evidence of age or race discrimination essentially requires the defendant to have made an admission that the adverse employment action was based on race and/or age, in other words, a "smoking gun that points to discrimination."  *Isbell*, 418 F.3d at 794 (quoting *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005)) (internal quotation marks omitted); *see also Dandy*, 388 F.3d at 272. However, admissions are very rare.  *See Jordan*, 396 F.3d at 832.

A Plaintiff can also use circumstantial evidence to prove intentional discrimination.  *Isbell*, 418 F.3d at 794.  Circumstantial evidence allows "the trier of fact to infer intentional discrimination

12

by the decisionmaker." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (internal quotation marks omitted). The circumstantial evidence may come in the form of: (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that the employees similarly situated to the plaintiff other than in race or age on which an employer is forbidden to base a difference in treatment received systematically better treatment; and (3) evidence that the plaintiff was qualified for the job in question but was passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005) (citing *Troupe v. May Dept. Stores* Co., 20 F.3d 734, 736 (7th Cir. 1994)). Circumstantial evidence is sufficient only when the plaintiff is able to construct "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Isbell*, 418 F.3d at 794 (quoting *Rhodes v. Illinios Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Troupe*, 20 F.3d at 737). The direct method requires that the circumstantial evidence must "point directly to a discriminatory reason for the employer's action." *Jordan*, 396 F.3d at 832 (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

In this case, Cole focuses on two comments made by her co-workers and repeated by Bachert to prove her claim of age based animus: (1) Cole was "not as sharp as she used to be," and (2) she was "confused." Notably, these comments originated with Cole's co-workers as opposed to Bachert. However, when considering evidence in the form of comments, the Court focuses on the timing of the comments and who made them. A comment that is made by someone not involved with the "employment decision of which the plaintiff complains [and who] expressed discriminatory feelings

is not evidence that the decision had a discriminatory motivation." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652 (7th Cir. 2000). However, when the decisionmaker expresses the discriminatory feelings "(1) around the time of, and (2) in reference to, the adverse employment action complained of," it is possible to make the inference that the decisionmaker was influenced by those feelings when making the decision. *Id.* (citing *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000)). Further, if someone other than the decisionmaker uttered the discriminatory remarks and the plaintiff can prove that "the attitude of the person who made the remarks tainted the decisionmaker's judgment, the remarks can be relevant to prove discrimination." *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1122 (7th Cir. 1998). Here, the comments about Cole were originally made by co-workers, but the comment regarding Cole not being as sharp as she used to be was later repeated by Bachert at his final meeting with Cole. Therefore, by making the comment around the time of terminating Cole's employment and in reference to her job performance, it is reasonable to infer that Bachert's decision was influenced by the comments.

In *Beatty v. Wood*, 204 F.3d 713 (7th Cir. 2000), the plaintiff relied on direct evidence to support a claim of age discrimination and offered as evidence a comment that the employer needed "new blood" in the workplace. 204 F.3d at 716. Focusing on the context, the Seventh Circuit held that this comment, in isolation, was not direct evidence of age based animus. *Id.* Similarly, in this case, Bachert commented that Cole "was not as sharp as she used to be" and also based his decision, in part, on episodes with patients reflecting poorly on Cole's job performance. As with the "new blood" comment in *Beatty*, Cole is unable to establish that these comments are direct evidence of age animus. The phrase "used to be" can refer not only to age, but may be a comparison with prior performance. The comment about not being sharp could be construed in many ways, including that

14

since Bachert arrived her performance had suffered, her performance had deteriorated since her evaluation in July, or that her job performance had declined since the first incident with the patient on the ventilator. Because the comment could be interpreted in a variety of ways, including solely as a commentary on Cole's job performance, the Court looks at the context in which the comments were made. These comments were made not long after there were three significant problems with Cole's patients allegedly as a result of Cole's action or inaction. Cole's co-workers clearly felt there was a change in her work performance, but the comment, without more, does not inherently suggest animus based on age.

Cole also argues that it is inconceivable that such a comment would be made about a young person, which does not appear so to the Court. An employer may notice a decline in productivity or attentiveness in an employee of any age and make a comment that the employee is "not as sharp as she used to be." Such a decline in work performance could be due to a variety of factors such as illness, depression, family loss, sleeplessness, non-work related concerns, too much homework, a new baby, or substance abuse.

Further, the term "confused" only arose after the Equal Employment Opportunity Commission ("EEOC") reports were filed by McDermott and Christensen. There is no evidence to suggest that Bachert used this term to describe Cole, which means that the comment was not made by the decisionmaker and it probably did not influence his decision. Even if this term influenced Bachert, the term confused is ambiguous and is not only used to describe the elderly. It may also have been used or implied by Christensen to describe the episode with the ventilator and the ambu bag to note that she believed Cole was confused about what step to take. A PRN of any age could be labeled confused if they were perceived to have forgotten the difference between two regularly

used medical devices.  Neither of these comments is the "smoking gun" needed to directly prove discriminatory intent.

In addition to her age claim, Cole cites Lincolnshire employment statistics to show that she and other African American employees and employees over the age of forty were taken off the schedule when Bachert became the supervisor.  The Seventh Circuit has held that "statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination."  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) (citing *Furr v. Seagate Tech.*, 82 F.3d 980, 987 (10th Cir. 1996)) (internal quotation marks omitted). "Standing virtually alone . . . statistics cannot establish a case of individual disparate treatment. *Id*. at 617.  Focusing on the number of employees that were terminated, Cole cites the Lincolnshire statistics that ten out of twenty-nine terminated employees were over the age of forty and that sixteen African Americans were terminated, discharged, or laid off in 2003.

Without explaining away the differences, a fair comparison cannot be drawn between Cole's termination and that of the others.  The statistical evidence is seriously flawed because it does not consider nondiscriminatory reasons for the disparities.  Cole has failed to suggest why obvious, alternative explanations for the terminations, discharges, and lay-offs were not the actual reason for the adverse employment action. In January and July of 2004, Lincolnshire continually employed more African Americans than Caucasians.  Further, the discharges occurred in similar percentages to the overall percentage of African American employees.  The statistics do not show age animus either because Lincolnshire consistently employed people over forty as half of their employees, and ten out of twenty-nine laid off individuals over the age of forty hardly demonstrates animus based on age.  Without more explanation, these numbers are insufficient to directly demonstrate

employment discrimination.   In fact, the numbers tend to prove the opposite of what Cole was trying to achieve: Lincolnshire appears to be an equal opportunity employer that hired employees of all ages and races and maintained and terminated them for reasons not related to race or age.

Cole contends that other African American PRNs, including Debra Wells, Nelsa Holman, and Monica English, were not being scheduled after Bachert became the supervisor.  This contention is unsupported by any evidence in the record.  In fact, Linclonshire was able to present evidence in the form of payroll records that all of these employees, including Cole, continued to receive hours after Bachert became the supervisor.   Cole makes the contention that Bachert's inability to remember who was scheduled in what months in 2003 is a sign that the payroll records are somehow fraudulent.   However, Cole fails to produce any evidence supporting this claim.   Neither the comments nor the statistics provide any basis for finding direct proof of discriminatory intent.  Nor does Cole offer a comparison of hours offered to Caucasian PRNs and those offered to African American PRNs after Bachert became the supervisor.

Even if this evidence is considered circumstantial and is considered as part of a whole, Cole still fails to demonstrate a convincing mosaic to prove discriminatory intent.  She cannot prove either suspicious timing, discriminatory comments or behavior, or statistical evidence that prove systematically better treatment of the unprotected group.  The evidence does not directly point to one ultimate conclusion that the action was based on age and/or racial animus.  Based on the lack of direct or circumstantial evidence, Cole cannot demonstrate through the direct method that the decrease in her hours and her ultimate termination were for illicit reasons.  Accordingly, the Court considers whether Cole can maintain her claims of discrimination with indirect evidence under the framework of *McDonnell Douglas*.

*3. McDonnell Douglas Framework*

A plaintiff who is unable to establish discriminatory intent under the direct method may still ultimately prevail under the familiar indirect burden-shifting method of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). *See Williams v. Waste Mgmt. Of Ill.*, 361 F.3d 1021, 1034 (7th Cir. 2004) (race); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001) (age). Using the indirect method set forth in *McDonnell Douglas*, Cole must first establish a prima facie case of discrimination. *See v. Lerner New York*, 243 F.3d 319, 322 (7th Cir. 2001). The prima facie case for age discrimination under the ADEA and for race discrimination under Title VII are similar. To establish a prima facie case for age discrimination under the ADEA, a plaintiff must demonstrate that (1) she was a member of the protected class of persons forty or older; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) the defendant treated substantially younger, similarly situated employees outside her class more favorably.[4] *See Wade*, 243 F.3d at 322.

Similarly, to establish a prima facie case of race discrimination under Title VII, a plaintiff must show that (1) she was a member of a protected class; (2) at the time of her discharge, she was meeting her employer's legitimate work expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees outside of her protected class. *See McDonnell Douglas*, 411 U.S. at 802; *Peters v. Renaissance Hotels Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002).

If Cole fails to establish even a single prong of the prima facie case, her claim cannot survive summary judgment. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002).

---

[4] The Seventh Circuit has held that "substantially younger" means at least a ten year age difference. *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997).

However, if Cole establishes a prima facie case for age and/or race discrimination, an inference of discrimination exists and the burden of production shifts to Lincolnshire to articulate a legitimate, non-discriminatory reason for the employment decision. *See McDonnell Douglas*, 411 U.S. at 802-03; *Wade*, 243 F.3d at 323. If Lincolnshire is able to produce a legitimate explanation, the inference of discrimination evaporates and the burden shifts back to Cole to prove that the proffered justification is a pretext for discrimination. *See Wade*, 243 F.3d at 323.

It is undisputed that Cole meets the first and third prongs of the prima facie case as she is a member of a protected class based on both her age and race and as she did suffer an adverse employment action. Therefore, the focus will be on the second and forth prongs which ask whether she was performing her job to the employer's expectations and whether she was treated less favorably than non-protected individuals.

In the Motion for Summary Judgement, Lincolnshire argues that Cole has failed to establish that she was performing her job to her employer's expectations or that she was treated less favorably than other employees outside the protected class. Lincolnshire contends that Cole endangered patient safety, and, therefore, her termination was reasonable. In response, Cole argues she was discriminated against based on her age because she was terminated and denied hours. Cole also argues that other similarly situated employees who were not in a protected class were treated more favorably and that there are reasons to believe the three incidents relied upon by Lincolnshire are suspect. The Court will address each issue in turn.

*a. Lincolnshire's Legitimate Expectations*

The Court finds that Cole cannot establish that she was meeting the legitimate expectations of her employer.  Lincolnshire has put forth evidence that on three occasions, Cole made errors in relation to patient care.  First, a respiratory therapist with almost twenty years of experience reported to Bachert that Cole incorrectly responded to a ventilator alarm and reached for an electric nebulizer rather than an ambu bag, which would have revived the patient.  Second, a respiratory therapist with twenty-seven years of experience reported to Bachert that a patient Cole had taken off CPAP in the morning and in whose nose she had placed a cannula for breathing during the daytime hours was found in distress because the oxygen had not been turned on when the patient was switched from CPAP to the cannula.  Third, the mother of a quadriplegic patient reported to Bachert that Cole had left an oxygen tank next to her son's face, which she stated could cause frostbite on his face.

In arguing that she was meeting their legitimate expectations, Cole relies heavily on her satisfactory performance evaluation from July 2003.  However, there are two problems with this evidence: (1) the evaluation was written before Bachert became Cole's supervisor; and (2) the evaluation occurred before the three incidents that endangered patient safety.  Cole's reliance on her earlier evaluation is misplaced as the Seventh Circuit has held that to properly analyze the second prong, the "critical issue is whether the employee was performing well in her job at the time of her termination." *Fortier v. Ameritec Mobile Commc'n*, 161 F.3d 1106, 1113 (7th Cir. 1998).  Further, although previous evaluations are important, the evaluations cannot, "standing alone, create a genuine issue of triable fact when . . . there have been substantial alterations in the employee's responsibilities and supervision during the intervening period." *Id*.  In the present case, a change in

supervisor did occur between the evaluation and the adverse employment action, as Bachert became her supervisor.

Second, Cole asserts that she could not meet her employer's expectations because Lincolnshire never took corrective action to make her aware that she was not adequately performing her job.  This argument is unpersuasive because it is not unreasonable to assume that she should be aware on her own when she had endangered a patient's life.  This is especially true when the patients are unable to help themselves if placed at risk.  Since the consequences of her possible failure are so dire, it is not inconceivable that Lincolnshire would reduce her hours and ultimately fire her after three separate incidents that threatened patient safety.  Although it may have been preferable for Lincolnshire or Bachert to have counseled Cole or addressed the problems immediately, the fact that Bachert chose instead to reduce Cole's hours is not, in and of itself, evidence of age or race animus.  Further, lack of documented disciplinary measures do not automatically indicate discrimination or that Cole's employers are satisfied with her work.  Rather, it could mean that because of her PRN status, as asserted by Bachert, Bachert incorrectly assumed he could reduce her hours rather than terminate Cole to spare her feelings.

Third, Cole attempts to cast doubt on the reports made by McDermott, Christensen, and Miller regarding her job performance.  Her arguments center on a lack of specificity in the affidavits and the lack of incident reports.  Although the affidavits do not state the specific dates, the uncontroverted evidence is that Bachert held the position of supervisor from September 1, 2003, through January 2004.  In his deposition, Bachert stated that the three incidents were reported to him during the period from September through December 2003.  Moreover, as Bachert was the decisionmaker, the Court looks at the impact those statements had on him and his decision to

decrease Cole's hours and ultimately terminate her employment.  Further, the lack of incident reports is not enough by itself to demonstrate that she was meeting Lincolnshire's legitimate expectations.  Bachert explained in his deposition that he did not wish to hurt Cole's feelings, which is why he did not bring these incidents to her attention.  Poor management on the part of Bachert does not automatically signify improper motive.

Finally, the Court recognizes that Cole denies each of these incidents.  Cole disputes the incident regarding the ambu bag, stating that she would have never used a nebulizer treatment because she knows that an ambu bag is what is used to help a patient breathe and that she did not reach for the nebulizer.  Cole states in her deposition that she did turn the oxygen on for the patient for whom she placed a cannula in his nose, and she also denies that she placed the oxygen tank next to the quadriplegic boy's face.  Again, however, Bachert, her immediate supervisor, believed that she was not performing her job satisfactorily because he believed those who had reported the incidents to him.  Accordingly, Cole has not established that she was meeting her employer's legitimate expectations at the time that she suffered the adverse employment action.

*b. Similarly Situated*

To establish the fourth prong of the prima facie case, Cole must show that she was similarly situated to employees who were treated more favorably.  This requires Cole to demonstrate "that there is someone who is directly comparable to [her] in all material aspects."  *Herron v. DaimlerChrysler, Co.*, 388 F.3d 293, 300 (7th Cir. 2004) (citing *Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir. 2002)) (internal quotation marks omitted).  In disciplinary cases, the plaintiff must show that she was disciplined more severely by her employer than a similarly situated employee

based on a forbidden reason.  *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)

(citing *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir. 1995)).   The plaintiff, further, must

demonstrate that the employee was similarly situated, in respect to performance, qualifications, and

conduct.  *Id*. Proving the fourth prong "normally entails a showing that the two employees dealt with

the same supervisor, were subject to the same standards, and had engaged in similar conduct without

such . . . mitigating circumstances as would distinguish . . . the employer's treatment of them."  *Id*.

at 617-18.  The plaintiff may use statistical evidence to prove similarly situated people outside of

the class were treated more favorably.  *See Chavez v. Illinois State Police*, 251 F.3d 612, 638 (7th

Cir. 2001).

Cole falls short of the requirements to demonstrate that similarly situated employees, who

were either a different race or younger than herself, were treated more favorably by Bachert or

Lincolnshire.  Although she points to two PRNs who were hired after her and the fact that they were

both Caucasian and significantly younger than she, the evidence is not enough to satisfy the forth

prong.  Most importantly, Cole does not provide any evidence that the new PRNs had similar

incidents that endangered patients and that Bachert or Lincolnshire did not terminate their

employment or decrease their employment hours.  Further, since she was not meeting Lincolnshire's

legitimate expectations, it is reasonable that she would be replaced by newly hired PRNs.  Also, in

his deposition, Bachert stated that in January 2004, he received two applications for PRN positions

from African American applicants and that one of the two was hired.

In addition, the statistical evidence presented by Cole is unpersuasive as there are two main

problems with Cole's reliance on them.  First, not all of the employees were terminated.  As noted

in Cole's brief, these employees were either terminated, discharged, or laid off employees.  Only

those employees that were terminated are similarly situated to Cole.  Further, only the treatment of those that were terminated for placing the patients at risk can be properly compared to Cole to demonstrate discrimination.  To establish this prong of the prima facie case, Cole would have to provide statistics that show those over forty or African Americans who had similar job performance problems were disproportionally terminated.  The employees in the statistics provided by Lincolnshire who suffered an adverse employment action may have suffered the adverse employment action for a variety of reasons that cannot be explained by the numbers themselves. Second, Cole fails to establish that the employees held the same position that she did within Lincolnshire or that these employees had the same supervisor.  Without this information, it is impossible to create an inference of discrimination.  Finally, the statistics show that a disproportionate number of African-Americans did not suffer an adverse employment action.  In 2003, Lincolnshire stopped employing twenty-nine people, of whom fifty-five percent were African American and thirty-four percent were over the age of forty.  Although there are no company-wide statistics for 2003, in 2004, of the 115 people employed by Lincolnshire, fifty-five percent were African American and fifty-two percent were over the age of forty.

*4. Legitimate Non-Discriminatory Reason*

Even if the Court were to find that Cole had established a prima facie case of race or age discrimination, Lincolnshire has articulated a legitimate, non-discriminatory reason for its decision. *See Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998).  In *Eiland*, the Seventh Circuit noted that one incident that placed a patient at risk through negligence was a legitimate and non-discriminatory reason for terminating a nurse.  *Id*.  In that case, a nurse gave a pregnant patient a

24

measles, mumps, and rubella injection ("MMR") without first inquiring if the patient was pregnant. *Id*. at 749.  This action placed both the mother and the unborn child at risk.  *Id*.  Noting that the supervisor honestly believed that this was the reason behind the nurse's termination and that this reason was a reasonable basis for the action, the court concluded there was no pretext to be found because the nurse failed to present evidence that "call[ed] into question the truthfulness of [the supervisor's] honestly held reasons for her termination." *Id*. at 753.  Notably, "the more objectively reasonable a belief is, the more likely it will seem the belief was honestly held."  *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1113 (7th Cir. 2004).

In the present case, like in *Eiland*, Lincolnshire's proffered reason for Cole's termination is legitimate and nondiscriminatory.  Bachert relied on reports from two experienced respiratory therapists and a mother to determine that Cole was a risk to her patients.  The risk to Cole's patients was even greater than that presented in *Eiland* as Bachert reasonably believed that three patients had been put at significant risk.  Further, the risk was even greater because these patients could not call for help on their own or help themselves.  In three separate incidents, Cole's negligence endangered patient safety which directly implicates her abilities as a respiratory therapist and not her age or race.

*5. Pretext*

The Court has found that Cole has not established a prima facie case of discrimination, but even if she had, once Lincolnshire has met its burden of production in articulating a legitimate reason for its adverse employment action, the burden shifts to Cole to prove pretext.  The Court finds that she cannot do so.

To establish pretext by a preponderance of the evidence, Cole can use a direct or indirect method. *Wade*, 243 F.3d at 323. The direct method demands that Cole demonstrate "that an employer was more likely than not motivated by a discriminatory reason . . . ." *Id.* (citing *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) (internal quotation marks omitted). To prove pretext indirectly, Cole must show that Lincolnshire's reasons are (1) factually baseless; (2) not the actual motivation for the discipline; or (3) insufficient to motivate the adverse employment action. *See Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) (race); *Valasco v. Illinois Dept. of Human Serv.*, 246 F.3d 1010, 1017 (7th Cir. 2001) (age); *Wade*, 243 F.3d at 323 (age). The issue of pretext does not "address the correctness or desirability of reasons offered for employment decisions. Rather it addresses the issue of whether the employer honestly believes in the reasons it offers." *Wade*, 243 F.3d at 323 (citing *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)) (age); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 752-53 (7th Cir. 1998) (race). Thus, if Lincolnshire "honestly believed" in the non-discriminatory reason, then it is irrelevant if Cole was disciplined for an action she did not commit or if those reasons are "foolish, trivial or baseless." *Wade*, 243 F.3d at 323 (citing *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997)); *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)

The ultimate burden remains on Cole to show that Bachert did not honestly believe the reasons for her termination and that there was not a reasonable basis for that belief. *See Eiland*, 150 F.3d at 752-53. Cole must prove more than "by her own standards she should have been treated better." *Wade*, 243 F.3d at 325 (quoting *Kuhn v. Ball State Univ.*, 78 F.3d 330, 331-32 (7th Cir. 1996)). Cole focuses her argument on the poorly conducted investigation headed by Bachert. However, as noted by the Seventh Circuit, a plaintiff's "energy is misspent by attacking the

company's decisional process, unless she could point to facts suggesting that the company investigated her claim differently because she was an older employee . . . ." *Kariotis*, 131 F.3d at 677.  In *Kariotis*, the employer conducted an investigation about an employee's medical leave, which only consisted of clandestinely videotaping her activities rather than speaking with the employee's doctor.  *Id*.  The Court noted that the investigation was not "world-class," but that was not enough on its own to show discrimination.  *Id*.  Therefore, the employee could not demonstrate pretext by showing that the employer engaged in an insufficient investigation, rather she needed to show that the employer treated her case differently than other employees.  *Id*.

Cole is unable to prove pretext through the direct method.  Cole presents no direct evidence that Lincolnshire did not honestly believe its proffered reason for terminating her employment. Nor is Cole able to demonstrate pretext indirectly.  First, Cole could attempt to prove that Lincolnshire's reasons have no basis in fact, but that is not the case here as Lincolnshire's account of the three incidents are supported by affidavits from two trusted and experienced respiratory therapists and a patient's parent.  Further, Bachert was able to conclude that Cole was McRoberts' primary caregiver on the day his ventilator was not properly attached.  Bachert concluded from Christensen's report and the ventilator flow sheets that McRoberts was in distress.  Cole stated that she did not reach for the nebulizer and that she would not have made such an error because she knows the proper procedure; she also denies the other two incidents.  However, her statements do not prove that there was no basis in fact for Lincolnshire's reasons in light of the affidavits from both respiratory therapists, the patient's mother, and Bachert.

Second, Cole could offer evidence to attempt to prove that the reasons presented by Lincolnshire are not the actual reasons for her termination.  Cole offers little to no evidence to prove

that Bachert had a hidden reason for discontinuing her hours. She cites employment statistics, criticizes the lack of investigation, and contends the three incidents were falsified, but none of this evidence satisfies her burden. To fulfill this evidentiary requirement, Cole would have to bring forth new evidence that demonstrates Bachert did not believe she was a risk to her patients. Cole references Bachert's statement that she was a "wonderful lady;" however, this statement simply shows that Bachert liked Cole as an individual but does not reflect his belief about her professional ability. Nor is Bachert's inability to remember the exact date he stopped offering her hours evidence of a hidden reason for her termination.

Third, Cole can demonstrate pretext by attempting to prove that the motivating reason was insufficient to justify termination. Like the previous two arguments, this falls short of its goal. As set forth above, Bachert believed Cole was placing patients in danger. After two incidents reported by experienced respiratory therapists and one reported by a parent, Bachert had reason to believe that Cole's job performance was declining and endangering patients. This is enough motivation to prompt termination.

Further, based on the "honest belief rule" followed in the Seventh Circuit, the only requirement to justify Bachert's reasons for terminating Cole is that he honestly believed his reasons for doing so. Even if Bachert's decision was incorrect or hasty or constitutes poor management, it does not create a pretext for the legitimate nondiscriminatory reason. From the evidence presented by Lincolnshire, Bachert honestly believed that Cole was placing patients at risk. This is enough to overcome any argument to the contrary presented by Cole. Further, Bachert may not have conducted the best investigation, but he trusted those who reported the incidents to him and did check patient records. Cole presents no evidence that Bachert conducted the investigation

28

differently because of her age or her race.  Therefore, Cole has not proved that the legitimate nondiscriminatory reason presented by Lincolnshire is mere pretext for discrimination.

## CONCLUSION

Based on the foregoing, the Court finds that Cole has not presented direct evidence of age or race discrimination, nor has she established a prima facie case of age or race discrimination, and that even if she could, Lincolnshire has proffered a legitimate, nondiscriminatory reason for Cole's termination that Cole is unable to demonstrate is a pretext for discrimination.  Accordingly, the Court **GRANTS** the Motion for Summary Judgment [DE 18] and **ORDERS** that judgment be entered in favor of the Defendant, Lincolnshire Health Care Center, and against the Plaintiff, Savanah Cole.  In light of this ruling, the Court **DENIES as moot** the Joint Motion for Continuance of Trial [DE 28].  All pretrial and trial dates are **VACATED**.

SO ORDERED this day 14th of October, 2005.


s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT


cc:  All counsel of record

29